Pro Se 3 (Rev. 12/16) The Defendant's Answer to the Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Illinois
_____ Division

| | | |
|---|---|---|
| Dandre R Grier | ) | Case No.  16-525-MJR-SCW |
| | ) | *(to be filled in by the Clerk's Office)* |
| *Plaintiff(s)* | ) | |
| (Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.) | ) ) ) ) | Jury Trial: *(check one)* ☐ Yes ☐ No |
| -v- | ) | |
| Officer Anderson, et al | ) ) ) | FILED<br>APR 1 2 2017<br>CLERK, U.S. DISTRICT COURT<br>SOUTHERN DISTRICT OF ILLINOIS<br>EAST ST. LOUIS OFFICE |
| *Defendant(s)* | ) | |
| (Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.) | ) ) ) | |

## THE DEFENDANT'S ANSWER TO THE COMPLAINT

I.  **The Parties Filing This Answer to the Complaint**

Provide the information below for each defendant filing this answer or other response to the allegations in the plaintiff's complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Jacob A Anderson |
| Street Address | 212 North Ohio Street |
| City and County | Olney, Richland County |
| State and Zip Code | IL, 62450 |
| Telephone Number | (618) 204-0055 |
| E-mail Address | jakea37@gmail.com |

II.  **The Answer and Defenses to the Complaint**

    A.  **Answering the Claims for Relief**

On a separate page or pages, write a short and plain statement of the answer to the allegations in the complaint. Number the paragraphs. The answer should correspond to each paragraph in the complaint, with paragraph 1 of the answer corresponding to paragraph 1 of the complaint, etc. For each paragraph in the complaint, state whether: the defendant admits the allegations in that paragraph; denies the allegations; lacks sufficient knowledge to admit or deny the allegations; or admits certain allegations but denies, or lacks sufficient knowledge to admit or deny, the rest.

## Count 1

I do admit to pushing the Plaintiff, but not in a malicious nature. I had made two verbal orders to get the Plaintiff to submit to a routine pat search, resulting in him becoming verbally combative and refusing by stating "fuck you". As we approached the tables in the dining hall, we were in close proximity to one another, and at that time the Plaintiff refused the second verbal order to submit to a random and routine pat search. At that time the Plaintiff in a sweeping motion from left to right elbowed me in my mid-torso with his left elbow. After the Plaintiff made physical contact with me, I created a reactionary gap by extending both my left and right hands in a forward motion to insure my safety. Once I could see both of the Plaintiff's hands were empty and free of any weapons or contraband, I grabbed the Plaintiffs left arm with both hands and attempted to detain the offender while repeatedly giving verbal orders to "cuff up" and "stop resisting". At this point the Plaintiff became an "active resister" and Lt. Vaughn deployed pepper spray in a sweeping motion from right to left to get him to comply to our orders to be placed in mechanical restraints. After the pepper spray was deployed, responding staff placed the offender on the floor. Once the Plaintiff was restrained, I stood up and had no further contact with him and returned to my Dietary Officer duties.

I deny the claim of deploying pepper spray, pushing him into the ground, and running his head into the wall.

## Count 3

I deny any deliberate indifference claims. Once the plaintiff was restrained, I had no contact with him. Movement staff entered the dining hall and escorted the Plaintiff out of the building. I had no knowledge of where they had, or had not taken him.

As far as the claims of me harassing the Plaintiff prior to this incident, I have no knowledge of any unprofessional behavior towards him. Any shakedowns that I performed were done off of my 30 day shakedown list and would be documented with IDOC. And I had never received any grievances from the Plaintiff during my career with IDOC. All of the Plaintiff's accusations are false and are unsubstantiated. Following are some attachments to confirm what I have disclosed is truthful and accurate.

## Attachments

1. Lawrence Correctional Center Offender Orientation Manual cover page and page 47, which states that offenders are subject to search at anytime.
2. Illinois Department Of Corrections Pre-Service Security Training Manual cover page. Page 8 from the Control Tactics section to show appropriate officer response for subject behavior. Page 3 from the personal search section to show procedure if an inmate refuses submit to a personal search. And page 10 to show the level of force with an officers response and discretion.
3. Inmate Griers first statement about the incident where he partly admits to refusing my orders to submit to a pat search. This statement was taken by Sgt. Harper on 8-2-15
4. Inmate Griers second statement about the incident, he goes into much more detail with his fabricated story and some details change. He does again admit to refusing my orders and to being resistive to being restrained by stating "reacted with instinct". This statement was taken by J. Bradley on 8-21-15
5. Officer Cales statement on the incident, it states that he did see inmate Grier make physical contact with me and his take on how everything transpired. This statement was taken by J. Bradley on 8-13-15.

    I hope that everything I have provided has shed some light onto what really took place, and the Plaintiff does not have any proof to back up his claims against me. The grievances that the Plaintiff has provided have all clearly been back dated and the rest is a fictional story made up as a vendetta against me and the other gentlemen involved for the Plaintiffs own personal gain. The attachments are all documents that can be found through the IDOC with their files and archives.

Sincerely,

    Jacob A Anderson

# LAWRENCE CORRECTIONAL CENTER

# OFFENDER ORIENTATION MANUAL

This manual will be reviewed and updated annually.

Revision

1/1/16

5. Offenders are responsible for their ID cards. Offenders are responsible for lost, stolen or damaged ID cards. A replacement cost of $5.00 will be charged for lost, stolen, or damaged ID cards. Any change in appearance that requires that a new ID card be issued will also cost $5.00. Offenders will be issued a new ID card every four years and should make every attempt to ensure they last the duration to prevent being charged for a new ID card.

6. Offenders may be searched at any time.

7. Employees and visitors are not to be subjected to any sexual harassment through lewd comments (i.e., catcalls and/or gestures).

8. Offenders are not allowed to answer or use Correctional Center staff telephones.

9. Reasonable advance notice of yard, gym and meal lines will be given. Offenders must be ready with shirts buttoned and tucked in when the cell doors are opened for these lines. Offenders will not be allowed to leave late for yard and gym. Late meals will be provided with a disciplinary report issued for offenders that are not prepared for movement.

10. If an institutional recount, power failure or severe weather occurs, all offenders will be returned to their assigned cells.

11. Offenders entering Dietary for meals must wear shirts with sleeves. Sleeveless shirts will not be allowed. Hats are not allowed except for offender workers assigned to Dietary. Offenders will be seated by staff and will take only one cup of water or milk with their meal.

12. All food and drink items are to be consumed in Dietary. NO FOOD OR DRINK ITEMS WILL BE ALLOWED TO LEAVE DIETARY. No food or supply items, i.e. tumbler, paper products, salt, pepper or bowls are to leave Dietary. NO EXCEPTIONS.

13. Dietary workers will not be released to work assignments without their dietary whites. Dietary workers will not leave their job assignment during the serving of a meal unless permission has been given by supervising staff.

14. No radios will be allowed in the gym area. Only gym shoes are allowed on the gym floor.

15. Running is strictly forbidden except when participating in games on the yard or in the gym.

16. The following behavior will result in disciplinary action: taking part in or pressuring others to take part in unauthorized organizational activities or meetings; displaying, wearing, possessing or using unauthorized organizational insignia or materials; giving unauthorized organizational signs. Security Threat Group activities, insignias, handshakes or related actions are not permitted and are considered a serious violation of the rules. Violators will receive harsh disciplinary sanctions.

17. No offender or group of offenders is permitted to have control or authority over another offender. If any offenders are found committing such behavior, every effort will be made to seek an indictment in the County Court if a crime has been committed, and the offender will also be disciplined under the provisions of Departmental Rule 504A.

18. Offenders are not allowed to gather in groups of more than five at any time or place unless during an authorized activity.

19. Offenders are not to be involved in, or attempt to involve others in, the trafficking of contraband. Offenders may not receive, give, loan or trade anything with another offender. Pressuring, intimidation, etc. will not be tolerated.

# ILLINOIS DEPARTMENT OF CORRECTIONS

JUSTICE • SERVING ILLINOIS

# Pre-Service Security Training

Effective
04/01/2013

## BEHAVIOR RESPONSE MODEL

| SUBJECT BEHAVIOR | OFFICER RESPONSE |
|---|---|
| Cooperative | Officer Presence<br>Verbal Dialogue<br>Handcuffs |
| Resister<br>• Passive Resister<br>• Active Resister | Officer Presence<br>Verbal Dialogue<br>Soft Empty Hands<br>Hard Empty Hands<br>Control Instruments<br>Impact Instruments<br>Chemical Agents<br>K-9 |
| Combative<br>• Agressive Assailant<br>• Deadly Force Assailant | Officer Presence<br>Verbal Dialogue<br>Soft Empty Hands<br>Hard Empty Hands<br>Control Instruments<br>Impact Instruments<br>Chemical Agents<br>K-9<br>Firearm |

*What should you do if a person refuses to submit to a personal search?*
If an **inmate** refuses to submit to a personal search, you should:
- Detain him/her.
- Notify your supervisor immediately.
- Follow your supervisor's instructions.
- Do not leave unattended, and maintain constant observation.

If an **employee** refuses to submit to an authorized personal search, you should:
1. Inform the employee that he is subject to disciplinary action for violating Departmental Rules and Administrative Directives.
2. Notify your supervisor and follow his instructions.
3. Do not leave unattended, and maintain constant observation.
4. Document the incident. 434

> **NOTE**: Employees who are suspected of carrying contraband can also be detained by the institution while a law enforcement agency is notified.

If a **visitor** refuses to submit to an authorized personal search, you should:
1. Detain the visitor while you notify your supervisor if there is a reason to believe that the visitor has contraband on his person. It is the responsibility of the Chief Administrative Officer or his designee to ensure that:
   a. The visitor is detained for a reasonable time.
   b. The Illinois State Police are immediately contacted to effect a search or an arrest, as appropriate. (A.D. 05.01.109)
2. Refuse entrance to, or remove visitor from, the institution for the day. (The Warden/Superintendent may issue a temporary or permanent stop order on the visitor.)
3. Do not leave unattended and maintain constant observation.
4. Document the incident. 431

## CLOTHED PERSONAL SEARCH   (Always wear gloves!)

*Who is subject to a clothed personal search?*   SEARCH BEFORE ENTERING FACILITY = TRUE
According to A.D. 05.01.109, the following people are subject to clothed personal searches:

1. **All persons entering or leaving a correctional facility in Illinois are subject to clothed personal searches** (i.e., visitors, security and non-security employees, workmen, etc.). *All department employees with the exception of the Director, Assistant Director, Chiefs, Deputy Directors, and the Chief Administrative Officer of the facility are subject to search unless the Director, Assistant Director, Chief of Operations, Deputy Director, or the Chief Administrative Officer of the facility personally grants an exception.*

   *Employees entering an adult facility shall be routinely subject to a daily pat down or body search. Searches shall be conducted on all shifts at varying intervals, but shall not be conducted on a regular schedule which would allow an employee to anticipate when he will be searched.*

   *Any employee who is working at or entering or leaving a facility may be required to submit to a body search at any time.*   2 YEARS ON FILE



Personal Search .................................................................................................................... 3

## Officer Response

- Firearm
- K-9
- Chemical Agents
- Impact Instruments
- Control Instruments
- Hands (Hard & Soft)
- Verbal Dialogue*
- Officer Presence*

*Discretion*

## Officer Presence and Verbal Dialogue

- Your <u>presence</u> - pride in the uniform, good posture and professional interaction, combined with skillful use of <u>language</u>, will lead to voluntary compliance by Inmates, 98% of the time!

## *Establish Control with Minimum Force*

- Body Language shows Self-Confidence;
- Self-confidence and Tone of Voice conveys Authority; and
- The words you choose equal Professionalism

10

Inmate D'ANDRE R. GRIER, M-04210, stated he was assigned to Housing Unit #1 C-wing. GRIER stated he had gone to eat on August 1, 2015, to the north side of dietary. GRIER stated he was the last inmate in line and had his food tray in his left hand. GRIER stated he was headed to sit down and was approached by ANDERSON, who got in his personal space. GRIER stated ANDERSON was so close to him, ANDERSON's stomach was touching his arm. GRIER stated ANDERSON ordered him to place his food tray down to be pat searched. GRIER stated he asked ANDERSON "man, what the fuck are you on?" GRIER stated ANDERSON pushed him with both hands forcefully against the wall. GRIER stated several other officers came over and started grabbing him. GRIER stated he was sprayed with pepper spray and taken to the ground. GRIER stated he was placed in handcuffs and brought to his feet. GRIER stated staff pushed his head into the wall. GRIER stated he was escorted to segregation, where he was placed in the shower and strip searched. GRIER stated he was placed in a cell, where he rinsed off the pepper spray. GRIER stated the nurse did not come to see him until later during medication line (Attachment #1).

Inmate D'ANDRE R. GRIER was re-interviewed and stated he had been having problems with an officer (identified as Correctional Officer OLIVER D. BANGERT) and had his parents call the facility to help him out. GRIER stated all this happened last year. GRIER stated he was moved to Housing Unit #8, where ANDERSON was the officer. GRIER stated ANDERSON started to shake him down all the time, so he had asked for ANDERSON's badge number to write a grievance. GRIER stated ANDERSON made the comment of "what? You going to have your parents call down here on me?" GRIER stated when ANDERSON said that he knew he was friends with BANGERT. GRIER stated ANDERSON always had something to say to him. GRIER stated he got moved several times over the next several months and had gone on a court writ. GRIER stated two days or so after coming back off his court writ, the incident happened in the dietary. GRIER stated he was the last one in line and had been talking to the inmate serving food. GRIER stated he was walking to sit down when ANDERSON came up and told him to put his tray down to be pat-searched. GRIER stated he knew ANDERSON had been messing with him in the past, so he asked ANDERSON "what the fuck are you on?" GRIER stated ANDERSON told me "put your fucking tray down and do a pat search." GRIER stated he was headed to the table to put his tray down and ANDERSON got all up on him. GRIER stated as he was putting the tray on the table and slightly turned to his right, ANDERSON pushed him against the wall with both hands. GRIER stated he had fallen a little and the next thing he knew there were four to five officers on him, grabbing at him. GRIER stated he reacted with instinct and was not intentionally trying to resist. GRIER stated mace was used and then he was taken to the floor. GRIER stated staff put their knee on top of his head and were bending / twisting his arms. GRIER stated after he was handcuffed, he was lifted to his feet and staff slammed his head against the wall. GRIER stated he was against the wall for a few seconds and then escorted out of Dietary. GRIER stated he was taken to segregation and not the Health Care Unit. GRIER stated staff ended up having to carry him to segregation because he was having problems breathing. GRIER stated he was placed in the shower and strip searched. GRIER stated he was taken to his cell where he rinsed off the OC spray the best he could. GRIER stated the nurse came around medication line time, about 8:30 p.m. GRIER stated CLARY told the nurse he did not need medical attention, but GRIER spoke up and told WELTY his thumb

and eyes were hurting. GRIER stated he then told WELTY he had a migraine. GRIER stated WELTY had asked him if he had any knots on his head. GRIER stated he told her he did not know, but his head really hurt. GRIER stated WELTY said "OK" and walked away. GRIER stated he did not see another nurse until three days later (Attachment #20).



Correctional Officer CHRISTOPHER D. CALES stated on August 1, 2015, he was in dietary seating inmates coming in to eat. CALES stated he saw ANDERSON and GRIER having words, so he began to walk in that direction. CALES stated he could not tell if GRIER put his tray down or not, but did see ANDERSON get shoved by GRIER. CALES stated he did see GRIER make contact with ANDERSON. CALES stated he did not recall if it was with both hands, just one, or if it was an elbow or forearm, but ANDERSON kind of took a step back and he saw the extension of GRIER's arm. CALES stated he rushed in to assist ANDERSON with restraining GRIER, but he resisted being restrained. CALES stated GOODRUM was there and GRIER continued to be non-complaint. CALES stated he gave several orders to GRIER to stop resisting. CALES stated VAUGHN at some point used OC spray to help GRIER comply. CALES stated GRIER was taken to the floor, where handcuffs were applied to GRIER. CALES stated GRIER was assisted to his feet and placed on the wall. CALES stated he believed he had GRIER'S right arm, but did not recall how GRIER was on the wall. After a short time, GRIER was escorted out of dietary by other staff that had come in to Dietary. CALES stated he had gone to the bathroom to rinse off some of the OC spray that had gotten on his arm (Attachment #17).

